11 A.3d 427

**In re Ann H. LOKUTA, Judge of the Court of Common Pleas, Eleventh Judicial District, Luzerne County.**

**Appeal of Ann H. Lokuta, Judge.**

Supreme Court of Pennsylvania.

Jan. 14, 2011.

224

226

George A. Michak, Harrisburg, Ronald Vincent Santora, Bresset & Santora, L.L.C., Forty Fort, for appellant.

Francis J. Puskas II, Joseph A. Massa Jr., Harrisburg, for appellee.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice EAKIN.

Appellant was elected to a ten-year term as a Luzerne County Court of Common Pleas judge in 1991 and retained to an additional term in 2001. In 2006, the Judicial Conduct Board charged her with: failing to be courteous with others while she was acting in her official capacity; conduct bringing her judicial office into disrepute; failing to promptly dispose of the court's business; failing to conduct herself at all times in a manner promoting confidence in the judiciary; failing to disqualify herself in a proceeding in which her impartiality may be questioned; and conduct prejudicing the proper adminis-

tration of justice. The Court of Judicial Discipline [1] named a panel consisting of Conference Judge [2] Sprague and Judges [3] O'Toole and Streib, to conduct the trial. At trial, the Board presented 30 witnesses, including Mark Ciavarella, then-President Judge of Luzerne County, Michael Conahan, ex-Luzerne County President Judge, William Sharkey, then-Luzerne County Court Administrator, and Jill Moran, then-Luzerne County Prothonotary.

The panel produced findings of fact and conclusions of law, to which appellant filed objections. The en banc court,[4] after hearing argument regarding the panel's recommendations, found the Board proved all charges against appellant by clear and convincing evidence. Amongst these findings, the court found appellant failed to recuse herself in a case named *State Farm Fire and Casualty Co. v. Bonner*, when the Bonners had supported her politically. The court also found she engaged in judicial misconduct by instructing a law clerk to "cut [a party's counsel] a new asshole." *In Re Lokuta*, 964 A.2d 988, 1104 (Pa.Ct.Jud.Disc.2008) (*Lokuta I*).[5] The court

1. The Court of Judicial Discipline consists of eight members, including three judges, one magisterial district judge, two attorneys, and two non-attorney electors. Pa. Const. art. V, § 18(b)(1). Upon the Board's filing of a complaint, the court must hold hearings and:

 The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.... A decision of the court may order removal from office, suspension, censure or other discipline as authorized by this section and as warranted by the record.

 *Id.*, § 18(b)(5).

2. A conference judge, appointed by the court's President Judge, presides over the pre-trial motions and conducts the pre-trial conference. Pa.C.J.D.R.P. 301(B)-(C).

3. Although we refer to the members of the Court of Judicial Discipline as "judges" throughout this opinion, such titling should not be construed as expressing any opinion as to whether membership of that court constitutes being a judge within the meaning of Pa. Const. art. V, § 16(b) ("Justices, judges and justices of the peace shall be retired on the last day of the calendar year in which they attain the age of 70 years.").

4. Judge Patrick Judge, Sr., now President Judge, recused himself in appellant's matter.

5. Judge Streib did not contest other matters determined by the court to be factual. The court found appellant was frequently absent and

ordered her removal from judicial office and prohibited her from holding any future judicial office. *Id.*, at 1134–36.

Judge Streib, joined by Judge O'Toole, filed a concurring and dissenting opinion. Judge Streib found Theodore Krohn, appellant's former law clerk, not credible; accordingly, she dissented on both issues to which Krohn testified. *Id.*, at 1136 (Streib, J., concurring and dissenting). Further, she would have found appellant's remark to Krohn to "cut [a party's counsel] a new asshole" to be merely an off-hand remark not so egregious as to violate the Code of Judicial Conduct. *Id.*, at 1136. Finally, Judge Streib argued the Board's allegation regarding *Bonner* was untimely raised. *Id.*, at 1137.

Three months after the Court of Judicial Discipline ordered appellant removed from office, the United States Attorney for the Middle District of Pennsylvania filed an information against Conahan and Ciavarella, and later indicted them. The information alleged Conahan and Ciavarella received money from Robert Powell, part owner of PA Child Care and Western PA Child Care juvenile detention facilities. Conahan and Ciavarella ensured the placement of juveniles with PA Child Care. We exercised our Kings' Bench jurisdiction to review

customarily showed up late for court. *Lokuta I*, at 1001. Appellant was "impatient, undignified and discourteous to court personnel," *id.*, at 1007, and created "a tense and stressful atmosphere.... [Her] treatment of the deputy sheriffs ... was so rude and upsetting that the sheriff had to rotate them out ... every hour or hour and a half." *Id.*, at 1008. Appellant created a tense atmosphere in her chambers that damaged her staff's ability to work. She isolated herself from, and was confrontational with, the rest of the courthouse. *Id.*, at 1034. Appellant publicly complained about Luzerne County's president judges in open court. *Id.*, at 1063. She falsely accused a deputy court administrator of assaulting her tipstaff. *Id.*, at 1067–70. Appellant failed to follow personnel rules established by the president judges. She handled fewer cases than other judges, and disposed of cases slower than other judges. *Id.*, at 1089. Appellant required a law clerk and a legal intern to provide personal services, including grocery shopping, yard work, and home maintenance. *Id.*, at 1098.

Accordingly, the court held appellant violated various canons of the Code of Judicial Conduct, and brought the judicial office into disrepute and prejudiced the proper administration of justice, in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution. *Id.*, at 1134–35. We will not review these findings except to the extent appellant has properly developed a challenge thereto.

234

Ciavarella's juvenile adjudications during the time in question, and ultimately expunged the records of those juveniles affected by Conahan's and Ciavarella's corruption. *See In re Expungement of Juvenile Records and Vacatur of Juvenile Court Consent Decrees or Adjudications from 2003–2008*, 2009 Pa. LEXIS 2286, *10–*11 (Pa. October 29, 2009) (*per curiam*) (finding Ciavarella's financial connections with PA Child Care tainted his juvenile adjudications). We also ordered new proceedings in cases where Conahan and Ciavarella's corruption created a perception of impropriety. *See Malinowski v. Nanticoke Micro Technologies, Inc.*, 2010 Pa. LEXIS 1372, at *5 (Pa. June 24, 2010) (*per curiam*) (remanding for new proceedings where Conahan and Ciavarella's conduct created appearance of impropriety); *Joseph v. Scranton Times L.P.*, 604 Pa. 677, 987 A.2d 633, 635 (2009) (*per curiam*) (ordering new trial after Conahan assigned case involving his friend to Ciavarella).

The United States Attorney later indicted Sharkey for embezzling Luzerne County funds. Moran then entered into a Stipulation of Compromise, whereby she agreed to resign her post and cooperate with the United States Attorney in its investigation. Powell has since pled guilty to failing to report a felony and accessory to tax evasion. Conahan has entered an open guilty plea to one count of racketeering. This litany of appalling conduct has already been well-documented by our own special masters and the Interbranch Commission on Juvenile Justice. *See, e.g., In re Expungement of Juvenile Records and Vacatur of Luzerne County Juvenile Court Consent Decrees or Adjudications from 2003–2008*, at *8–*9; Interbranch Commission on Juvenile Justice, *Report*, at 9–19 (May 2010).

In response to these revelations, this Court remanded appellant's case to

[t]he Court of Judicial Discipline for the limited purpose of that court considering [appellant]'s claims in the nature of after discovered evidence, arising from the recent revelations of corruption in Luzerne County. The Court of Judicial Discipline is to determine whether the new evidence

requires a further hearing and/or whether it affects the existing determination of the Court of Judicial Discipline to remove [appellant] from judicial office.

*In re Lokuta,* 600 Pa. 504, 968 A.2d 227, 227 (2009) (*per curiam* ) (*Lokuta II* ). We also stayed the Court of Judicial Discipline's order removing appellant from the bench and preventing her from holding judicial office pending remand, and stayed the election to fill her judicial seat. *Id.*

On remand, the court denied appellant relief and reaffirmed its decision to remove her from the bench. The court noted that for appellant to prevail on her after-discovered evidence claim, she must show her evidence is not used merely for impeachment, and the evidence must prove likely to change the outcome of her case. *In re Lokuta,* 989 A.2d 942, 948 (Pa.Ct.Jud.Disc.2010) (*Lokuta III* ) (citing *Commonwealth v. Dennis,* 552 Pa. 331, 715 A.2d 404, 415 (1998)). The court determined "Conahan's, Ciavarella's and Sharkey's criminal behavior could certainly be used to question their credibility; but that is *all* it could be used for." *Id.,* at 950–51 (emphasis in original). Further, the court found this corruption was not likely to produce a different outcome, as the corruption was unrelated to appellant's behavior, and the other witnesses against her were credible.

Judge Streib, joined by Judges Musmanno and O'Toole, filed a dissenting statement. Judge Streib argued appellant should have been able to fully develop the extent of corruption in Luzerne County, and this Court did not intend for the Court of Judicial Discipline to conduct an after-discovered evidence analysis. *Id.,* at 960 (Streib, J., dissenting). She noted while the court previously criticized appellant for her isolation from other Luzerne County judges, such isolation was now understandable. *Id.* Further, she would consider the corrupt environment to which appellant was exposed as a serious mitigating factor warranting a reduced sanction. *Id.*

Appellant now raises the following claims on appeal, which we have reordered for ease of discussion: (1) whether Judge Sprague should have recused himself; (2) whether Judge

Sprague and two other members of the court were ineligible to sit on appellant's proceeding; (3) whether the court construed our remand order too narrowly; (4) whether the court erred in considered evidence pertaining to *Bonner*; (5) whether the Board acted in bad faith in prolonging its investigation; (6) whether the court improperly admitted untimely evidence of misconduct; (7) whether the Board's deputy chief counsel's failure to appreciate the quasi-judicial nature of judiciary disciplinary proceedings denied her due process; (8) whether she was improperly denied access to exculpatory evidence; (9) whether the court improperly limited her cross-examination; (10) whether the Board failed to prove its case against her; (11) whether her on-bench conduct could not have brought the judiciary into disrepute; (12) whether the Board selectively prosecuted her; (13) whether the Board engaged in prosecutorial misconduct by overlooking Conahan and Ciaveralla's corruption; (14) whether various claims pertaining to material submitted under seal warrant relief; and (15) whether her sanction violated equal protection.

A judicial officer has the right to appeal a final adverse order of the Court of Judicial Discipline to this Court. Pa. Const. art. V, § 18(c)(2). The Pennsylvania Constitution provides

On appeal, the Supreme Court ... shall review the record of the proceedings of the court as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful. The Supreme Court ... may revise or reject an order of the court upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court ... shall affirm the order of the court.

*Id.* We now turn to appellant's claims.

## I. Judge Sprague's Recusal

Judge Sprague, who was an attorney member of the Court of Judicial Discipline, served as Conference Judge. He decided the pre-trial motions, was one of the three court members

who presided over appellant's trial, and authored the court's opinions in *Lokuta I* and *Lokuta III*. He also, through his private law practice, represented PA Child Care and Powell. Prior to trial, appellant moved to recuse Judge Sprague, because Moran was a member of Powell's law firm and two of appellant's potential witnesses had been in litigation against Powell or Judge Sprague. Judge Sprague denied this motion. In her post-verdict motion, appellant argued Judge Sprague should have recused himself, highlighting Moran's testimony, and claiming Judge Sprague relied upon Conahan and Ciavarella's testimony. The court dismissed appellant's post-verdict motions.

On remand, appellant again moved for Judge Sprague's recusal, contending the after-discovered evidence proved Conahan, Ciavarella, Moran, Sharkey, and Powell were corrupt. She further claimed Judge Sprague must have independently possessed knowledge of matters relevant to her case, and his duty as Conference Judge and Powell's counsel conflicted.

Judge Sprague filed a memorandum denying appellant's recusal motion. Judge Sprague denied his representation of Powell involved any discussion of appellant or of the proceedings against her. Judge Sprague maintained "no evidence was presented that in any way demonstrated any relationship between the federal investigation and the charges against [appellant]." Court of Judicial Discipline Memorandum, 5/13/09, at 3 (Sprague, J.). He found he had no personal knowledge of the facts in the proceeding, and he had no personal bias concerning any party. Judge Sprague additionally observed appellant's claim that Conahan and Ciavarella orchestrated her ouster was belied by her testimony that she had cordial relations with Ciavarella. He further noted he did not bar damaging disclosures regarding them, noting there was no ruling regarding his clients. He also observed he did not sit alone, but his trial rulings were made together with Judges O'Toole and Streib.

Appellant contends Judge Sprague's representation of Powell and PA Child Care should have disqualified him from judging her case, because Powell was intimately involved in

Conahan and Ciavarella's misconduct. She claims Judge Sprague made evidentiary rulings limiting the public disclosure of Powell and PA Child Care's involvement with Conahan and Ciavarella at her trial. Appellant notes Judge Sprague represented PA Child Care before Conahan in a case the United States Attorney later identified as being part of Conahan's corruption.[6]

The Board argues judicial misconduct giving rise to an appearance of impropriety is not present here. The Board claims appellant never even attempted to present evidence about the corrupt relationships between Powell, PA Child Care, Conahan, and Ciavarella. It further alleges this corruption does not corroborate her claim that witnesses conspired to fabricate evidence against her. The Board also notes appellant never identified any exhibit or witness which would have been harmful to Powell, PA Child Care, Conahan, or Ciavarella. Thus, the Board contends appellant cannot show how Judge Sprague improperly precluded information harmful to Powell or PA Child Care.

 An appellate court presumes judges are fair and competent, and reviews the denial of a recusal motion for an abuse of discretion. *Commonwealth v. Whitmore*, 590 Pa. 376, 912 A.2d 827, 834 (2006) (quoting *Commonwealth v. Druce*, 577 Pa. 581, 848 A.2d 104, 108 (2004)). Nonetheless, an "'appearance of impropriety is sufficient justification for the grant of new proceedings before another judge. . . . A jurist's impartiality is called into question whenever there are factors or circumstances that may reasonably question the jurist's impartiality in the matter.'" *Joseph*, at 634 (quoting *In*

6. Conahan, in a motion to dismiss the indictment against him, alleged he, Ciavarella, and Powell entered into a joint defense agreement during appellant's trial. Appellant argues Judge Sprague was conflicted as he was representing Conahan at the same time he testified. To prove this, she asks us to take judicial notice of this factual averment in Conahan's motion to dismiss. If appellant has to refer to Conahan's motion to dismiss to prove the existence of this alleged joint defense agreement, it is not common knowledge; further, Conahan's factual averments cannot be considered a "source[ ] whose accuracy cannot be reasonably questioned." Pa.R.E. 201(b). Accordingly, we decline to take judicial notice of this allegation, and this claim fails.

*Interest of McFall,* 533 Pa. 24, 617 A.2d 707, 713 (1992)). " 'There is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings.' " *Id.* (quoting *In Interest of McFall,* at 714).

Appellant does not show Judge Sprague abused his discretion in denying her recusal motions.[7] Appellant does not establish which objections Judge Sprague improperly ruled on, or what evidence regarding Conahan and Ciavarella's corruption she would have introduced had it not been for Judge Sprague. Thus, appellant's appeal of Judge Sprague's denial of her recusal motions fails for lack of development. *See Commonwealth v. Walter,* 600 Pa. 392, 966 A.2d 560, 566 (2009) (failure to sufficiently discuss issues will cause them to be waived).

Nonetheless, certain factual circumstances can create an appearance of impropriety requiring a new proceeding before a new judge. In *McFall,* the sentencing judge agreed to serve as an agent for federal prosecutors after the prosecutors caught her accepting a bribe. This constituted an appearance of impropriety, as the judge was sentencing criminal defendants while seeking to curry favor with prosecutors. *McFall,* at 711–12. In *Joseph,* Joseph sued a newspaper for

---

7. Appellant argues Judge Sprague's bias is evidenced by his order to disclose the names of federal investigators she talked to. The record shows the court's pre-trial order required the parties to disclose the "names and addresses of all witnesses expected to testify at trial." Court of Judicial Discipline Order, 4/17/07, at 1. In her witness list, appellant listed unnamed and unspecified federal investigators. Respondent's Revised Witness List, 7/6/07, at 21. The Board sought to compel appellant to disclose the names and addresses of the federal investigators. Motion to Compel and for Sanctions, 8/10/07, at 3–5. The court ordered appellant to provide these names and addresses. Court of Judicial Discipline Order, 8/28/07, at 1. Appellant sought reconsideration *en banc,* Motion for Reconsideration, 9/5/07, at 1–2, which was denied. Court of Judicial Discipline Order, 9/10/07, at 1. She then amended her witness list to remove any reference to federal investigators. Amendment to Respondent's Revised Witness List, 9/14/07, at 1. Thus, appellant sought to circumvent the order. Appellant fails to show how Judge Sprague's relationship with Powell influenced his enforcement of the pre-trial order. Accordingly, appellant fails to show how this ruling creates an appearance of impropriety.

defamation after it implied he was associated with a reputed mobster. Conahan was associated with, and accepted unmarked envelopes from this mobster; the mobster said the outcome of the case would be favorable to Joseph. Conahan assigned the case to Ciavarella, who failed to reveal to the parties that he and Conahan were receiving payoffs from Powell. We concluded these circumstances created an appearance of impropriety. *Joseph*, at 635–36. In *Malinowski*, we ordered new proceedings in one of Ciavarella's cases where Conahan was a board member of one of the parties, and that party loaned money to an entity owned by Conahan's and Ciavarella's wives. *Malinowski*, at *5.

Such circumstances are not present here. Powell was not a participant or witness, nor was he otherwise related to, appellant's case. While Judge Sprague did have an attorney-client relationship with Powell, the parties knew about this relationship. Appellant does not establish Judge Sprague received illicit payments from anyone. Appellant provides no evidence Judge Sprague obtained evidence, or formed an opinion regarding her or her case, based on his relationship with PA Child Care or Powell, and appellant fails to show what evidence of Conahan's corrupt relationship with Powell she would have introduced. Additionally, Judge Sprague was just one of three judges presiding over appellant's trial and one of seven court members deciding her case, and appellant does not attempt to explain how Judge Sprague's private legal practice affected other court members. Accordingly, appellant fails to show Judge Sprague's relationship with Powell created an appearance of impropriety.

## II. Composition of the Court of Judicial Discipline

■■ Appellant challenges the composition of the Court of Judicial Discipline. She claims Judge Sprague was constitutionally ineligible to serve on the court because of his age. She notes the Pennsylvania Constitution requires mandatory retirement for the judiciary at the age of 70. *See* Pa. Const. art. V, § 16(b) ("Justices, judges and justices of the peace shall be retired on the last day of the calendar year in which

they attain the age of 70 years."). As the Court of Judicial Discipline was established as part of the Constitution's judiciary article, and because Pennsylvania has a unified judiciary, appellant argues this constitutional restriction should apply to the court. Because Judge Sprague exceeded the age of 70, she reasons he was ineligible to sit on the court. Appellant also claims Judges Musmanno and Bucci's service as Board members, during the early stages of its investigation of her, precluded them from judging her case on the Court of Judicial Discipline. *See Lyness v. Commonwealth, State Board of Medicine,* 529 Pa. 535, 605 A.2d 1204, 1209 (1992) (finding if administrative agency performs both prosecutorial and judicial functions, due process requires those functions be separated).

The Board claims appellant waived these arguments because she did not raise them until after her trial, when she included them in the final paragraph of her Objections to the Board's Findings of Fact and Conclusions of Law. Further, as the Constitution refers to the composition of the court as "members," the Board argues the retirement age for judges does not apply to the Court of Judicial Discipline. The Board also contends Judges Musmanno and Bucci were not disqualified from deciding appellant's case because neither of them participated in the Board's review of her case or its decision to file charges against her.

■ "[A] party seeking recusal or disqualification [is required] to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." *Goodheart v. Casey,* 523 Pa. 188, 565 A.2d 757, 763 (1989) (citing *Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority,* 507 Pa. 204, 489 A.2d 1291, 1298 (1985)). Appellant did not mention Judge Sprague's age in her pre-trial recusal motions, nor did she move to disqualify Judges Musmanno or Bucci before or during trial. She provides no reason for not raising either of these issues sooner. Because appellant failed to raise these issues at the earliest possible opportunity, they are waived.

### III. Scope of the Remand Order

On remand, the Court of Judicial Discipline unanimously construed this Court's order, and its reference to recently revealed corruption, to be limited to the informations and indictments against Ciavarella, Conahan, and Sharkey, and Moran's Stipulation of Compromise. *Lokuta III*, at 949. The court determined there would be no discovery, but permitted appellant 90 days to investigate her claims and present additional evidence. *Id.*, at 946.

Appellant argues the court improperly limited the scope of its review to the court filings. Appellant claims she should have been able to place her case in the context of this corruption, as explained by the reports of our special masters and the Interbranch Commission. Appellant contends such a context would allow her to prove Conahan and Ciavarella manipulated witnesses into testifying against her.

The Board contends it was reasonable for the court to construe "recent revelations of corruption" as limited to the corruption known at the time this Court issued its remand order. The Board observes the court allowed appellant to investigate, and she was unable to provide evidence showing witnesses conspired to bear false witness against her.

The issue of whether the Court of Judicial Discipline properly interpreted this Court's remand order is a matter of law; accordingly, our scope of review is plenary. *See* Pa. Const. art. V, § 18(c)(2) (scope of review for questions of law is plenary); *In re Milton Hershey School*, 590 Pa. 35, 911 A.2d 1258, 1261 (2006) ("As this is a purely legal question, our standard of review is *de novo* and scope of review is plenary."). We remanded appellant's case "for the limited purpose of that court considering [appellant]'s claims in the nature of after-discovered evidence, arising from the recent revelations of corruption in Luzerne County." *Lokuta II*, at 227. Appellant was able to offer evidence based on the corruption revealed shortly before our remand order. Nonetheless, she seeks to introduce evidence of Luzerne County corruption discovered after our remand order. However, our order did

not refer to future, potential, or soon-to-be revealed allegations of corruption. Further, appellant does not indicate at which point future revelations of corruption would be irrelevant—she cannot seek a new trial with every new indictment or newspaper report? Such potentially unlimited reexamination of appellant's case would destroy the public interest of finality. *See McCleskey v. Zant*, 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) ("One of the law's very objects is the finality of its judgments."). Further, allowing appellant to repeatedly reopen her case would frustrate Luzerne County's interest in filling the currently vacant judicial seat. Therefore, because our remand order explicitly referred to evidence arising from the then-recently revealed corruption, the Court of Judicial Discipline did not err in construing it to exclude evidence arising from later discovered allegations of corruption.

## IV. *Bonner*

At trial, Theodore Krohn, appellant's former law clerk, testified appellant presided over a bench trial in *State Farm Fire and Casualty Co. v. Bonner*, Luzerne County Docket No. 2147–C–2000. He testified he thought State Farm should prevail, but appellant indicated "she was going to decide in favor of the Bonners because they were a somewhat prominent Italian family in the Hazelton area who had supported [appellant] politically." *Lokuta I*, at 1112. As the Board had not mentioned this case in its complaint, appellant objected, claiming she had no notice of it. The court permitted the Board to amend its complaint to include *Bonner*, finding appellant had sufficient notice because the Board informed her about *Bonner* more than a year before. The court further reasoned even if the Board raised *Bonner* in its complaint, the outcome would have been no different. *Id.*, at 1112–14.

Appellant alleges the Board failed to set forth sufficiently particularized notice of the charges against her, denying her due process by depriving her of the opportunity to defend

against the charges. Appellant highlights *Bonner*, where she was sanctioned despite not receiving notice in the complaint.[8]

The Board contends the court acted within its proper discretion in allowing it to amend its complaint. The Board alleges it did not include *Bonner* in its complaint because Krohn could not properly identify the case, and it was only introduced when Krohn unexpectedly referred to it during direct examination. Nonetheless, the Board suggests appellant was given notice of the existence of this claim on three occasions more than a year before Krohn testified. Further, appellant had nearly two months from when *Bonner* was identified until Krohn completed his testimony. Thus, the Board argues she had ample notice of *Bonner*.

"[T]he Conference Judge may, in his or her discretion, permit substantive amendments to a Board Complaint with the written consent of the Judicial Officer or after a hearing on the motion in open court." Pa.C.J.D.R.P. 303(a). "It is well-settled ... the right to amend pleadings is within the sound discretion of the trial court and should be liberally granted." *Ash v. Continental Insurance Co.*, 593 Pa. 523, 932 A.2d 877, 879 (2007).[9] Appellant was informed of Krohn's allegations more than a year before he testified. Although the case's name was not revealed until trial, appellant still had more than a month to prepare a response. Further, appellant

8. Appellant also suggests the court improperly admitted *Bonner* as pattern evidence. However, she did not object to the admission, nor did she raise the claim before the court in her Objections to the Findings of Facts and Conclusions of Law. Accordingly, this argument is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Although Pa.R.A.P. 302(a) is not in the Rules for Appeals from the Court of Judicial Discipline, the issue-preservation requirement embodied therein applies to judicial disciplinary proceedings. *See, e.g., In re Lokuta*, 2009 Pa. LEXIS 2566, *1 (Pa. November 24, 2009) (*per curiam* ) ("Once a final order is entered [on remand appellant] may, if she opts to file an appeal, raise preserved claims of error."); *In re Melograne*, 571 Pa. 490, 812 A.2d 1164, 1167 (2002) (finding challenge to court's authority was waived).

9. While *Ash* was a civil case, appellant advances no argument why this well-settled standard should not apply in judicial disciplinary proceedings.

does not further identify how she was prejudiced by the court's decision to allow the Board to amend its complaint. She does not indicate she was unable to complete any necessary investigation or procure witnesses. Thus, the court did not abuse its discretion in permitting the Board to amend its complaint and introduce evidence regarding *Bonner*. Likewise, as appellant does not show how she was prejudiced by the admission of *Bonner*, she cannot prove her due process rights were violated. *See Commonwealth v. Brado*, 470 Pa. 306, 368 A.2d 643, 645 (1977) ("Under most circumstances, a claim of due process violation requires a showing of identifiable prejudice...."). Accordingly, this claim fails.

## V. Duration of the Board's Investigation

The Board received the initial complaint against appellant on April 27, 2004, and filed charges on November 27, 2006. Pursuant to then-existent Judicial Conduct Board Rule of Procedure 31,[10] the Board had 180 days to dismiss the

**10.** Rule 31 provided:

(A) Except as provided in paragraph (C), within 180 days of the Board's receipt of the Judicial Officer's written response pursuant to Rule 30(B)(2)(c) or written response to any subsequent letter requesting information by the Board, the Board shall:
(1) dismiss the complaint upon a finding that there is no existing probable cause to file formal charges;
(2) dismiss the complaint with the issuance of a letter of counsel upon a determination that, even if the alleged conduct occurred, it was not conduct which requires that formal charges be filed, provided that the Judicial Officer:
(a) consents in writing;
(b) stipulates that the letter of counsel may be used during proceedings involving new complaints against the Judicial Officer; and
(c) agrees to and satisfies any conditions required by the Board; or
(3) authorize the filing of formal charges with the Court of Judicial Discipline.
(B) If the Board dismisses a complaint following a full investigation, Chief Counsel shall promptly notify the Judicial Officer and the complainant.
(C) Exceptions.
(1) The Board may continue a full investigation of a matter beyond the 180-day period set forth in paragraph (A) upon a good faith belief that further investigation is necessary.

complaint, file charges against appellant, or grant a continuance. The Board granted all necessary continuances prior to filing charges against appellant. Appellant claimed the duration of the Board's investigation violated Rule 31. The court acknowledged it had previously dismissed a complaint when the Board failed to exercise diligence. *Lokuta I,* at 1126 (quoting *In re DeLeon,* 902 A.2d 1027, 1031 (Pa.Ct.Jud.Disc. 2006)). The court observed the delay in *DeLeon* was without explanation, as the Board conducted only one interview over the course of a year and a half, and the Board admitted it violated Rule 31. The court distinguished *DeLeon,* noting the Board spent six months obtaining appellant's mental health evaluation, and appellant caused further delay by opposing the Board's deposition of her. Therefore, the court concluded the Board conducted the investigation with diligence. *Lokuta I,* at 1127.

Appellant, admitting the Board facially complied with Rule 31, contends the Board lacked good faith in granting the continuances. She argues the Board front-loaded its investigation, conducting most of it before issuing the Notice of Full Investigation, and delayed filing charges to circumvent Rule 31's spirit.[11]

The Board insists it diligently investigated appellant. The Board argues its continuances were appropriate, as it was still

(2) The Board may defer disposition of a complaint pursuant to paragraph (A) upon discovery or receipt of additional, corollary, or cognate allegations which may necessitate an investigation.

(3) The receipt of the Judicial Officer's written response to any Rule 30(B) notice or supplemental or investigatory letter is a necessary prerequisite to the tolling and calculation of the 180–day period set forth in paragraph (A). Thus, the 180–day time period is wholly inapplicable if the Judicial Officer fails to file a written response and the investigation will continue to conclusion.

Pa. Jud. Conduct Bd. R.P. 31 (rescinded 2007).

11. Appellant claims two of her potential witnesses died before trial, and a third was suffering dementia. Appellant never claims the loss of these witness prejudiced her. One of these witnesses died in 1999, five years before the Board received the initiating complaint. Appellant does not explain how the testimony of the other two witnesses would have been relevant or helpful to her case. Thus, this argument fails for lack of development. *See Walter,* at 566.

investigating and waiting on appellant's mental health examination. The Board distinguishes *DeLeon*, noting there it violated Rule 31, and without explanation, did nothing for 18 months. The Board alleges it properly investigated here before issuing a Notice of Full Investigation, as it may " 'conduct interviews and examine evidence to determine whether grounds exist to believe' " a judicial officer engaged in misconduct. Board's Brief, at 39 (quoting Pa. Jud. Conduct Bd. R.P. 26(A)).

The Court of Judicial Discipline found "[t]he facts establish that the Board conducted this investigation with diligence." *Lokuta I*, at 1127. As this is a factual finding, we may only reverse if it is clearly erroneous. *See In re Hasay*, 546 Pa. 481, 686 A.2d 809, 812 (1996) (citing Pa. Const. art. V, § 18(c)(2)) ("In an appeal by a judicial officer from an order imposing discipline, the standard of review for factual questions is the clearly erroneous standard."). The Board interviewed and deposed witnesses until November, 2005. The Board then spent six months obtaining a mental health examination of appellant, after which appellant spent three months resisting the Board's subpoena to depose her. Appellant offers no evidence, beyond her own speculation, that the Board acted without diligence or in bad faith. Therefore, we cannot hold the Board's finding was clearly erroneous.[12] Accordingly, this claim must fail.

## VI. Timeliness of the Board's Allegations

Testimony at trial referenced events occurring in the 1990s; appellant objected, claiming such testimony was time-barred. The court observed there are no statutory time-bars on judicial disciplinary proceedings, but Board Rule 15 [13] limits

12. *DeLeon* offers appellant no refuge, as in *DeLeon* there was no question the Board violated Rule 31. Here, appellant admits the Board complied with Rule 31, and cannot prove the Board acted without diligence.

13. Rule 15 provides:

Except where the Board determines otherwise for good cause, the Board should not consider complaints arising from acts or omissions occurring more than four years prior to the date of the complaint,

the evidence the Board may present. *Lokuta I*, at 1127. However, the court found the Board may consider otherwise untimely evidence if it is part of a pattern of misconduct, and the last episode of misconduct occurred no earlier than four years before the Board received the initiating complaint. *Id.*, at 1128. The court noted most of the evidence against appellant occurred within the four years prior to the filing of the initiating complaint, and evidence pre-dating that time was part of the same pattern of recurring judicial misconduct. Thus, conduct occurring more than four years before the Board received the complaint was admissible because the Board established a pattern of recurring judicial misconduct. *Id.*, at 1128–29.

Appellant argues Rule 15 only permits timely allegations of current misconduct to facilitate the inclusion of similar prior misconduct. She contends pattern evidence was used improperly here to prove "current misconduct in conformity with unproven allegations of prior misconduct." Appellant's Brief, at 44. Appellant also claims the Board improperly included allegations against her from previously dismissed complaints. *See* Pa. Jud. Conduct Bd. R.P. 16(A) (rescinded 2007) ("If the Board dismisses a complaint ... the allegations in the complaint shall not be used against the Judicial Officer for any purpose in any other judicial disciplinary ... proceeding.").

The Board admits there was a prior complaint and claims appellant knew its contents. However, the Board contends appellant waived her argument by failing to offer any evidence regarding the prior complaint's contents, not objecting when a witness mentioned the prior complaint, and not raising the claim in her Objections to the Findings of Facts and Conclusions of Law.

Appellant baldly claims pattern evidence was improperly used to prove she acted in conformity with her alleged prior

provided, however, that when the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to such an alleged pattern of conduct.
Pa. Jud. Conduct Bd. R.P. 15.

misconduct. However, she does not reference any specific evidence or cite any instance of record where the Board used pattern evidence to show she acted in conformity with prior misconduct. Therefore, appellant's Rule 15 claim fails for lack of development. *See Walter,* at 566.

We also find appellant's argument that the Board improperly included evidence from previously dismissed complaints to be waived. Appellant, despite filing lengthy and detailed Objections to the Findings of Fact and Conclusions of Law, did not claim the Board included allegations from a previously dismissed complaint, nor does she identify where she previously raised this claim. Accordingly, this claim was not preserved before the Court of Judicial Discipline, and cannot be raised now. *See* Pa.R.A.P. 302(a).

## VII. Due process in discovery

Testifying before the Interbranch Commission, the Board's deputy chief counsel identified judicial disciplinary proceedings as " 'not a criminal proceeding against a judge. It's really a civil administrative disciplinary proceeding with what has been identified as quasi-criminal overtones.' " Appellant's Brief, at 33 (quoting N.T. Interbranch Commission Proceedings, 2/2/10, at 121). Appellant argues because the deputy chief counsel, who oversaw the Board's responses to her discovery requests, did not understand judicial disciplinary proceedings are quasi-criminal in nature, she was denied due process. The Board contends appellant fails to raise any appellate issue, as the Court of Judicial Discipline's rules, and not counsel's perceptions, governed discovery.

■ "Judicial conduct proceedings have been held to be quasi-criminal in nature; thus, the defendant is granted constitutional rights afforded to criminal defendants." *In re Berkhimer,* 593 Pa. 366, 930 A.2d 1255, 1258 (2007) (citing *In re Chiovero,* 524 Pa. 181, 570 A.2d 57, 61 (1990)). However, appellant fails to specify how her constitutional rights were violated because counsel stated "overtones" instead of "nature." She does not identify any discovery violation or other violation of her rights resulting from this statement. Accord-

ingly, this claim fails for lack of development. *See Walter*, at 566.

## VIII. *Brady* claims

Appellant, raising a *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claim, argues the Board improperly withheld exculpatory material. She claims such exculpatory material includes witness statements, prior complaints, current and prior complaints against Conahan and Ciavarella, court records, audio recordings, and transcripts of court proceedings. Appellant argues the court should have allowed her to subpoena documents from witnesses and the Board's investigator. Appellant also contends the Board should have disclosed the Anonymous Complaint.[14]

The Board claims the materials appellant sought were neither exculpatory nor relevant to her case. Regarding the Anonymous Complaint, the Board argues a confidential letter filed against another judge, containing nothing exculpatory, need not have been disclosed to her.[15]

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, at 87, 83 S.Ct. 1194. The prosecution's duty to disclose evidence, pursuant to *Brady*, may include material impeachment evidence in addition to material excul-

14. The Anonymous Complaint refers to an unsigned eight-page complaint, received by the Board on September 28, 2006, alleging Conahan, with Ciavarella's aid, engaged in multiple acts of misconduct. The Anonymous Complaint alleged Conahan used his power to help his friends, presided over matters presented by attorneys who were his close personal friends and business acquaintances, and often ordered Powell's cases be assigned to Ciavarella. The Anonymous Complaint was not disclosed until the Board included it as an exhibit during remand proceedings in this matter.

15. The Board contends appellant's discovery claims are waived because she failed to raise them at trial and in her Objections to the Findings of Fact and Conclusions of Law. However, as appellant raised her discovery claims pre-trial, and there is no proof she knew about the Anonymous Complaint during trial, we address the merits.

patory evidence. *Commonwealth v. Bond,* 604 Pa. 1, 985 A.2d 810, 821 (2009) (citing *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 854 (2005)). Evidence is material, and relief required, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different." *Id.* (citing *Lambert,* at 854). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Id.,* at 822 (quoting *Commonwealth v. Chambers,* 570 Pa. 3, 807 A.2d 872, 887 (2002) (citation omitted)). Similarly, to obtain relief for discovery violations, appellant must show the discovery violation prejudiced her. *See In re Cicchetti,* 560 Pa. 183, 743 A.2d 431, 445 (2000) (finding no discovery violation when judicial officer did not explain how requested information would be significant or relevant).

██ Here, appellant failed to prove she was prejudiced by the Board's purported discovery violations. She claims the Board withheld favorable witnesses' statements, but she does not provide details of the content of these statements. She further claims she was entitled to have the Board's investigator, as well as multiple witnesses, produce documents. However, aside from a general assertion that these documents would be favorable to her, she does not explain how they were material.

The Anonymous Complaint only mentioned appellant in passing, alleging Conahan reassigned a case from appellant to himself. The Anonymous Complaint also alleged appellant sometimes handled juvenile cases before Conahan assigned Ciavarella to Juvenile Court. Despite appellant's repeated claims that Conahan corralled witnesses into testifying against her, the Anonymous Complaint makes no mention of such orchestrations. The Anonymous Complaint contains no information exculpating her; thus, if the Anonymous Complaint is to be material pursuant to *Brady,* it must be material impeachment evidence. The Board presented 30 witnesses, all of whom the court found credible. Even assuming the Anonymous Complaint would have destroyed Conahan's, Ciavarella's,

and Sharkey's credibility, appellant fails to explain how it would have impacted the credibility of the Board's other 27 witnesses. She does not explain how the testimony of Conahan and Sharkey was so critical to the case against her that without it she is entitled to a new trial. Because appellant fails to adequately explain how any of the Board's purported non-disclosures were material, her *Brady* claim must fail. Similarly, appellant's discovery claims fail because she cannot show she was prejudiced by the lack of discovery.[16]

## IX. Cross–Examination

Appellant argues the court improperly limited her cross-examination of multiple witnesses, including herself, to Conahan's purported corrupt influence over appellant's case, thus limiting her ability to explore a witness's bias or self-interest. Specifically, appellant contends the court limited her cross-examination of Conahan regarding his distribution of the Board's chief counsel's business cards, which she believes proves Conahan organized the case against her. Appellant further claims the court should not have found the Board's witnesses credible when she did not have the opportunity to adequately cross-examine them.

The Board reviews appellant's references to the record, and notes in some of those occasions, appellant's cross-examination was not limited by any objection or court ruling. On all other occasions, the Board argues appellant failed to preserve her objections to the court's limitations of her cross-examination. *See Thompson v. Thompson,* 963 A.2d 474, 477 (Pa.Super.2008) (finding waiver for failure to object to limitation or hurrying of cross-examination).

■■■ It is well settled the "trial court has the discretion 'to determine the scope and limits of cross-examination and that

16. Because the Board tabled action on the Anonymous Complaint due to the pendency of her trial, appellant argues her case should be dismissed and the Board's counsel and deputy counsel should be sanctioned. As the prosecutor's intentions are irrelevant to *Brady* claims, this allegation is irrelevant to appellant's *Brady* claim. *See Bond,* at 821 (*Brady* disclosure required regardless of good or bad faith of prosecutor).

this Court cannot reverse those findings absent a clear abuse of discretion or an error of law.'" *Commonwealth v. Rivera,* 603 Pa. 340, 983 A.2d 1211, 1230 (2009) (quoting *Commonwealth v. Nolen,* 535 Pa. 77, 634 A.2d 192, 195 (1993)). Appellant cites 22 instances of purported improper limitation of cross-examination.[17] All but two of these instances are part of one long string cite to the testimony of multiple witnesses. In five of these 20 purported instances, appellant's cross-examination of the witness was unfettered. N.T. Trial, 9/25/07, at 359; *id.,* at 524; *id.,* at 526; *id.,* at 527; N.T. Trial, 9/28/07, at 1472. In four additional occasions, appellant cites to direct examinations. N.T. Trial, 9/25/07, at 541; *id.,* at 542; N.T. Trial, 1/14/08, at 2837–42; N.T. Trial, 1/16/08, at 3692–93. Appellant offers no explanation as to how these rulings made during direct examinations, or her unimpaired cross-examination, constitute an improper limitation of her cross-examination. Thus, appellant's claim with respect to these nine instances fails.

Of the remaining 11 instances, appellant globally claims her questions were directed to show the witnesses' bias or interest by exposing Conahan's corruption. She does not address any instance individually, or explain how her questioning would have shown the witnesses' bias or otherwise aided her case. Accordingly, her claims with respect to these 11 instances fail for lack of development. *See Walter,* at 566.

 Appellant, however, did develop an argument regarding Conahan's cross-examination. Nonetheless, her first citation to Conahan's testimony refers to the Board's direct examination of Conahan. N.T. Trial, 1/16/08, at 3692–93. In the other citation, appellant asked Conahan, "How many people have you given [the Board's chief counsel's card] to?" *Id.,* at 3715. Conahan replied, "Conservatively, between 50 and a hundred. People came to me to complain. Now whether they did anything, I don't know." *Id.* The court *sua sponte* struck the last part of Conahan's answer as irrelevant to appellant's question. Appellant did not object to the court's striking part

17. Appellant actually offers 26 citations, but four are redundant as they cite to a different part of a ruling already cited.

of Conahan's question. It is well settled, "[w]henever counsel objects to a question asked by opposing counsel, and the objection is sustained, an exception is granted automatically; a formal request for an exception is unnecessary." *Foster v. McKeesport Hospital,* 260 Pa.Super. 485, 394 A.2d 1031, 1032 (1978). However, "an objection to excluded testimony may be waived if counsel acquiesces in the exclusion without obtaining a ruling by the court." *Id.* (citing *Commonwealth v. Frazier,* 467 Pa. 505, 359 A.2d 390, 391–92 (1976) (Roberts, J., concurring)). As appellant failed to object to the court *sua sponte* striking part of Conahan's answer, or to otherwise ask the court to reconsider its decision, she acquiesced to the exclusion of this statement and waived any objection thereto. Accordingly, appellant's cross-examination claims fail.

## X. Sufficiency of the Evidence

 Appellant argues the Board failed to prove her misconduct by clear and convincing evidence. She contends Conahan, Ciavarella, Sharkey, and Moran were the anchor of the Board's case; now that they are discredited, there is insufficient evidence to support the Board's case. She suggests the testimony of other witnesses was not credible, as they were subject to Conahan and Ciavarella's influence.[18]

The Board notes questions of credibility and conflicts in evidence are not for appellate courts to resolve. The Board contends appellant challenges the court's credibility determinations, and as the Board presented 30 witnesses who often corroborated each other, sufficient evidence supported the court's finding that the Board's witnesses were credible. The Board also claims the testimony of Conahan, Ciavarella, Sharkey, and Moran was not central to its case, and appellant failed to show any of its other witnesses were manipulated to testify against her.

18. Appellant also contends the court improperly refused to admit documentary evidence purportedly contradicting witness testimony. However, appellant fails to explain how this evidence was improperly excluded, or how this documentary evidence contradicts witness testimony. Thus, this claim fails for lack of development. *See Walter,* at 566.

 The court found all of the Board's witnesses credible, *Lokuta III*, at 951; appellant now challenges this determination.[19] This Court reviews the Court of Judicial Discipline's factual findings to ensure they are not clearly erroneous. Pa. Const. art. V, § 18(c)(2). We have stated:

> The Judicial Conduct Board is responsible for investigating and bringing charges, and at trial, the board must prove the charges by clear and convincing evidence. In considering whether the evidence presented is clear and convincing, the court must find the witnesses to be credible, and the facts and details to be distinctly remembered. The witnesses' testimony must be sufficiently clear, direct, weighty, and convincing.

*In re Berkhimer*, at 1258 (citations omitted). " '[Q]uestions of credibility and conflicts in the evidence presented are for the trial court to resolve, not our appellate courts.' " *Commonwealth v. Myers*, 554 Pa. 569, 722 A.2d 649, 651–52 (1998) (quoting *Commonwealth, Department of Transportation, Bureau of Traffic Safety v. O'Connell*, 521 Pa. 242, 555 A.2d 873, 875 (1989)). " 'As long as sufficient evidence exists in the record which is adequate to support the [credibility] finding ... we are precluded from overturning that finding.' " *Id.* (quoting *O'Connell*, at 875).

Here, appellant cannot show the court's credibility findings are not supported by sufficient evidence. While four of the witnesses have now been exposed as criminals, appellant overstates their importance. Conahan was only called to refute claims appellant made during her testimony. Ciavarella's testimony mainly concerned her chambers and assignments, and he was not even discussed by the court in *Lokuta I*. Moran's testimony was corroborated by another witness and a court transcript. As for the remaining 26 witnesses, all appellant offers is speculation that they were manipulated into testifying against her. Such speculation as to the coercion of

19. Appellant's argument focuses on the credibility of the Board's witnesses. Except for her challenge regarding her on-bench conduct, discussed *infra*, appellant has waived any other basis for challenging the sufficiency of the Board's case.

multiple witnesses does not prove there is insufficient record evidence supporting the court's credibility determinations. Thus, appellant cannot overcome the deference owed to the Court of Judicial Discipline as the trial court and establish that court's credibility findings were clearly erroneous. Because appellant offers no other argument showing the Board failed to prove its case, her sufficiency claim cannot prevail.

## XI. Appellant's Conduct on the Bench

The Court of Judicial Discipline found appellant's on-bench conduct brought the judiciary into disrepute. Appellant claims her on-bench conduct could not have brought the judiciary into disrepute because it was Conahan and Ciavarella's misconduct, not her conduct, that brought the judiciary into disrepute. She further contends her on-bench conduct is speech protected by the United States and Pennsylvania Constitutions and is entitled to immunity.

The Board argues appellant has waived this claim because she failed to raise any free speech argument before the court, and she does not cite to which specific conduct was protected speech. We agree. Appellant never argued to the Court of Judicial Discipline that her on-bench conduct was protected speech, Conahan and Ciavarella's horrific misconduct nullified her distinct misconduct, or her actions were protected by any immunity. Accordingly, these claims are waived. *See* Pa. R.A.P. 302(a).

## XII. Selective Prosecution

Appellant argues the Board selectively prosecuted her, claiming the Board did not pursue other misbehaving jurists, including Conahan and Ciavarella, as vigorously as it prosecuted her. The Board contends appellant cannot prove selective prosecution, as she does not show it singled her out for any invidious reason, nor does she show she was similarly situated to any other jurist.

To prove selective prosecution, appellant must show "first, others similarly situated were not prosecuted for similar conduct, and, second, the Commonwealth's discriminatory se-

lection of them for prosecution was based on impermissible grounds such as race, religion, the exercise of some constitutional right, or any other such arbitrary classification." *Commonwealth v. Mulholland,* 549 Pa. 634, 702 A.2d 1027, 1034 (1997) (citing *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). Appellant fails to develop any argument as to how her prosecution was based on impermissible grounds. Therefore, this claim fails for lack of development. *See Walter,* at 566.

## XIII. Prosecutorial Misconduct

Appellant argues Conahan facilitated the Board's case against her, as he handed out business cards of the Board's chief counsel. She claims the Board had a cordial working relationship with Conahan and shielded him from investigation because it was pursuing the case against her. Appellant contends the Board's shielding and use of Conahan, despite the Anonymous Complaint giving it notice of his misconduct, constitutes prosecutorial misconduct.

The Board claims appellant's prosecutorial misconduct claim is unfounded, as Conahan had no control over the Board or its decisions, and he did not file the initial complaint. It contends the Anonymous Complaint did not reveal that Conahan committed perjury at appellant's trial. The Board further alleges appellant did not show how the absence of the Anonymous Complaint prejudiced her to the extent of precluding a just verdict.

This Court has explained:

The phrase "prosecutorial misconduct" has been so abused as to lose any particular meaning. The claim either sounds in a specific constitutional provision that the prosecutor allegedly violated or, more frequently, like most trial issues, it implicates the narrow review available under Fourteenth Amendment due process.... However, "[t]he Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty." The touchstone is the fairness of the trial, not the culpability of the prosecutor. If the defendant thinks the

prosecutor has done something objectionable, he may object, the trial court rules, and the ruling—not the underlying conduct—is what is reviewed on appeal. Where, as here, no objection was raised, there is no claim of "prosecutorial misconduct" as such available.

*Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 28–29 (2008) (citations omitted).[20]

 Appellant again overstates Conahan's role in the case against her, as he was merely a rebuttal witness. As for appellant's perjury claims, she does not explain how the Anonymous Complaint proved Conahan perjured himself at her trial. However alarming the Anonymous Complaint's allegations were, they were just that—anonymous allegations—and by themselves were insufficient to prove perjury. Additionally, appellant does not show how the Board's failure, albeit inexplicable, to pursue another judge on the marginally related Anonymous Complaint denied her a fair trial when 30 credible witnesses testified against her. Appellant does not explain how Conahan's distribution of business cards violated her due process rights or prejudiced her. As appellant cannot prove she was denied a fair trial, her prosecutorial misconduct claim must fail.

## XIV. Sealed materials

In 2009, after Conahan and Ciavarella's corruption was exposed, a complaint was filed with the Board indicating Conahan wanted appellant removed from her judicial proceeding and took steps accordingly. After an investigation, the Board dismissed this complaint. The Court of Judicial Discipline ordered all filings related to this 2009 complaint be placed under seal. After a hearing, the court found these materials did not qualify as after-discovered evidence; thus, appellant was not entitled to relief. Further, during the course of remand, it was discovered the Board failed to turn

**20.** Appellant raised her prosecutorial misconduct claim before the court during remand proceedings, and thus preserved this claim for appellate review.

over the report of a 2004 interview it conducted with the person who filed the initial complaint against appellant.

Appellant argues the Board's investigation was inadequate and the court erred in not permitting her to use the 2009 complaint on remand. She claims the 2009 complaint supports her argument that Conahan exercised undue influence over Luzerne County courthouse personnel. Appellant argues she was prejudiced by the Board's failure to disclose evidence she claims shows Conahan orchestrated the charges against her. She also contends it engaged in prosecutorial misconduct by failing to correct Conahan's purported false testimony with the Anonymous Complaint and ignoring Conahan's misconduct while pursuing her.

The Board argues the complaint does not qualify as after-discovered evidence because it was cumulative of Conahan's known animus towards appellant. The Board further contends this complaint could only be used to attack the witnesses' credibility, and could not mitigate the overwhelming evidence of appellant's judicial misconduct. The Board, conceding it should have disclosed the 2004 interview report, maintains there was not a reasonable probability the case would have been different had it disclosed the report. The Board asserts appellant cannot show its failure to pursue Conahan's misconduct constituted prosecutorial misconduct depriving her of a fair trial.

To prevail on her after-discovered evidence claim, appellant must show "(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 595–96 (2007) (citing *Commonwealth v. D'Amato,* 579 Pa. 490, 856 A.2d 806, 823 (2004)). Here, appellant cannot prove the 2009 complaint satisfies the requirements for after-discovered evidence. Appellant may have used material from the 2009 complaint to question the credibility of two witnesses against

her; however, after-discovered evidence must be used for more than impeachment. Evidence regarding Conahan's animus towards appellant is cumulative, as the discord between appellant and Conahan was well established at trial. Conahan's purported attempts to assure appellant's removal from office are irrelevant because appellant cannot show they occurred at a relevant time. Thus, appellant is not entitled to relief based on the 2009 complaint.

As for appellant's allegation regarding the Board's failure to disclose the 2004 interview report, the Board correctly notes appellant raises a *Brady* claim. To obtain relief on a *Brady* claim, the non-disclosed evidence must be material. Evidence is material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different." *Bond,* at 821 (citing *Lambert,* at 854). The interview report does not contain exculpatory information. Even if the report was used to impeach the complainant, it still would not have impeached the testimony of the 29 other witnesses. Because appellant cannot show there is a reasonable probability the outcome of her trial would have been different had this interview report been disclosed, she cannot prove her entitlement to relief.

Appellant's prosecutorial misconduct claims are likewise unpersuasive. In addressing prosecutorial misconduct claims, "[t]he touchstone is the fairness of the trial, not the culpability of the prosecutor." *Tedford,* at 28 (citing *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). We have already rejected appellant's *Brady* claim based on the Anonymous Complaint, as appellant failed to show it was material to her case. The Anonymous Complaint mentions appellant only in passing, does not refer to any conspiracy or plot against her, and would not have impeached 27 credible witnesses who testified against her; thus, it would not have undermined the fairness of appellant's trial. Accordingly, appellant cannot prove she was denied a fair trial because of the Board's failure to disclose the Anonymous Complaint.

Appellant next claims Conahan, with the Board's acquiescence, corralled witnesses to testify against her. While there is no doubt Conahan disliked appellant, even now that he and Ciavarella have been exposed, appellant cannot prove he persuaded witnesses to testify against her. During trial, the court found the testimony of Conahan and other witnesses credible when they said they did not collude against her. Appellant offers only rank speculation to show the Board knew Conahan colluded against her. Such speculation is insufficient to prove she received an unfair trial.

As for appellant's selective prosecution claim, she must show "first, others similarly situated were not prosecuted for similar conduct, and, second, the Commonwealth's discriminatory selection of them for prosecution was based on impermissible grounds such as race, religion, the exercise of some constitutional right, or any other such arbitrary classification." *Mulholland,* at 1034 (citing *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). Appellant suggests Conahan was similarly situated to herself, and the Board did not prosecute him because it was selectively prosecuting her. She fails to show any arbitrary classification, such as race, religion, or the exercise of a constitutional right, motivated the Board to pursue her. Therefore, her selective prosecution claim fails. For the above reasons, appellant is not entitled to relief based on the sealed materials.

## XV. Sanction

Appellant claims the court's sanction of removing her from the bench violated her equal protection rights. Appellant contends her sanction was harsher than that imposed on judges who engaged in more egregious misconduct.

The Board observes the court found appellant brought disrepute upon the judiciary, prejudiced the proper administration of justice, and violated the Code of Judicial Conduct. The Board contends appellant cites no case within the scope and breadth of her misconduct. After briefly summarizing appellant's misconduct, the Board notes appellant showed no remorse for her actions.

In reviewing the Court of Judicial Discipline's sanctions of a judicial officer, our review is limited to whether those sanctions were lawful. Pa. Const. art. V, § 18(c)(2); *see also In re Berkhimer*, at 1259 ("[T]he purpose of our review is not to re-weigh the sanction against aggravating or mitigating circumstances, but to determine whether the sanction is lawful."). "The Pennsylvania Constitution, art. V, § 18, sets forth removal as an available sanction for bringing disrepute upon the judicial office." *Id.*, at 1260. "The Court of Judicial Discipline is charged with protecting the integrity of the judiciary and upholding public confidence in the judicial branch...." *Id.*, at 1259–60 (citing *In re Melograne*, 571 Pa. 490, 812 A.2d 1164, 1168 (2002)). " 'In disciplining a judicial officer, that tribunal not only punishes the wrongdoer, but also repairs the damaged public trust and provides guidance to other members of the judiciary regarding their conduct.' " *Id.*, at 1259 (quoting *In re Melograne*, at 1168).

The Court of Judicial Discipline had lawful authority to impose removal from office as a sanction for appellant's misconduct. Further, appellant cannot prevail on her equal protection argument. She does not detail the sanction imposed on any other jurist, or explain how another jurist's conduct was more egregious than her own. Similarity of misconduct does not require identicality of sanction, for there are other factors that bear on that decision, including mitigating and aggravating considerations and how a particular jurist's misconduct undermines public confidence in the judiciary. In focusing only on her misconduct and nothing more, appellant ignores these other factors, including, for example, her lack of remorse [21] at her misconduct. As she cannot show her equal protection rights were violated, she is not entitled to relief regarding her sanction.

Accordingly, the Court of Judicial Discipline's opinions and sanction are affirmed. Appellant's Application for Oral Argu-

21. *See* N.T. Sanction Hearing, 12/9/08, at 103.

ment and Sealed Application for Oral Argument are denied as moot.

Jurisdiction relinquished.

Justices TODD and McCAFFERY join the opinion.

Justice BAER files a concurring opinion.

Justice SAYLOR files a dissenting opinion.

Chief Justice CASTILLE and Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Justice BAER, concurring.

I concur in the result reached by the Majority Opinion; however, I write separately to articulate my analysis of the recusal issue, the scope of the remand order, and the strength of the argument in favor of a new evidentiary hearing on sanctions. Before turning to these specific issues, I address overarching considerations relating to the history of this case and why I am ultimately able to join the determination of the Majority Opinion. I also briefly review the procedural history of this case.

In many ways, this Court and the Court of Judicial Discipline (CJD) are sailing in uncharted waters. We have never been faced with the horrific corruption we now know existed in Luzerne County, perpetrated primarily by former president judges, Michael Conahan and Mark Ciavarella. During the same general timeframe that this perversion of justice was being perpetrated, approximately thirty individuals presented testimony of atrocious judicial behavior on the part of Judge Lokuta. We are now presented with a claim by Judge Lokuta that the corruption of the former president judges tainted the testimony of all of the other witnesses at her trial, justifying a new sanction hearing.

Her current claim is at least superficially supported by her persistent assertions during trial that former judge Conahan had orchestrated her prosecution. That claim, which once seemed farfetched, now appears to be at least plausible. Indeed, a natural reaction, following the disquieting revela-

tions, is to conclude that the corruption of the former president judges and their alleged lackeys, William Sharkey, the former court administrator, and Jill Moran, the former prothonotary, must have infected the trial, where all four were substantive witnesses against Judge Lokuta and most other witnesses were to some extent under the former president judges' power.

It is noteworthy that this Court has made extraordinary, but entirely justified, rulings in other cases infected by the former president judges. It would certainly be within reason to do the same in a case involving the removal of an elected, seventeen-year veteran of the bench of Luzerne County. Thus, my initial, knee-jerk inclination was to vacate the potentially tainted proceedings against Judge Lokuta, and to award her a new trial.

After an intense review of the record and careful consideration of all of the arguments, however, I conclude that such a result is not supportable. To the contrary, it is my conclusion that, notwithstanding my comments below, the CJD provided Judge Lokuta with a full and fair proceeding, and the Judicial Conduct Board proved its case against her. Even after disregarding the testimony of Conahan, Ciavarella, Sharkey, and Moran, the conclusions of the CJD remain fully supported by testimony of over twenty witnesses. Indeed, while implying that the events the witnesses described never occurred, Judge Lokuta is careful not to assert directly that the testimony presented was false, instead, claiming that the witnesses "embellished" their testimony in an effort to please the president judges. As discussed below, she fails to produce any specific evidence supporting her bald contention that these witnesses "embellished" any of their testimony during her trial, nor her unspoken implication that they committed perjury. Accordingly, after reviewing the record, I join with my colleagues in affirming the CJD's ultimate determinations.

In its detailed 226–page opinion of October 2008,[1] prior to the revelations of corruption, the CJD found that Judge

---

1. This opinion was authored by Conference Judge Richard A. Sprague. He and his firm represented Robert Powell and PA Child Care. Mr.

Lokuta repeatedly breached numerous aspects of the Judicial Code and the Pennsylvania Constitution, including the following litany of violations:

(1) "that [Lokuta] was habitually and egregiously late for court and frequently was not in the courthouse at work when she should have been," *In re Lokuta*, 964 A.2d 988, 1005 (Pa.Ct.Jud.Disc.2008);

(2) that Judge Lokuta's conduct in the courtroom impeded the work of court reporters, court clerks, attorneys, and deputy sheriffs, such that "[t]heir ability to function was so severely affected by [Lokuta's] ill-treatment of them and by her volatile and unpredictable behavior in her courtroom that they developed an aversion to assignment to her courtroom," *id.* at 1033;

(3) that Judge Lokuta's in-chambers behavior was similar to her courtroom behavior such that "one gets the picture of something out of Lewis Carroll or Dickens rather than of the chambers of a judge of the court of common pleas," *id.* at 1062;

(4) that Judge Lokuta inappropriately criticized the president judges in open court, such that "Reading the words spoken by [Lokuta] in open court one first is startled by their thoroughly derogatory content, and by the animosity with which they are delivered. Reading on, however, the exercise soon becomes a tiresome one, finally a reader finds himself embarrassed-for [Lokuta]." *id.* at 1066;

(5) that Judge Lokuta created a disturbance in the halls of the courthouse, witnessed by several courthouse employees, when a deputy court administrator refused to meet with her immediately because he had to attend an appointment with his wife's oncologist following her mastectomy, and then falsely accused the deputy administrator of physically abusing her and her tipstaff and demanded disciplinary action for something he did not do; *id.* at 1089;

Powell and PA Child Care have been tied to the corruption in Luzerne County. The recusal issue discussed herein is premised upon the supposition that Conference Judge Sprague's representation of Powell and PA Child Care should have required his recusal in the instant matter.

(6) that Judge Lokuta failed to cooperate with the president judges and failed to do the work of the court, specifically, "The record is permeated with credible testimony from a variety of witnesses who corroborate [Lokuta's] recalcitrance regarding caseload and cooperation," *id.* at 1094;

(7) "the extensive use of court personnel to carry out the personal business and chores of a judge at the judge's residence and elsewhere, is so extreme as to constitute conduct which brings the judicial office into disrepute," where the conduct included requiring a law clerk to scrub floors in her house on county time, *id.* at 1103;

(8) in regard to the Violet O'Brien case, "this judge's bias against this lawyer was such that it undoubtedly affected his clients' case," *id.* at 1105; and

(9) in regard to the Bonner case, that Judge Lokuta instructed her law clerk to draft an opinion in favor of a party whose family has supported her politically, *id.* at 1116.

Based upon these findings and a rejection of Judge Lokuta's defenses, the CJD concluded that Judge Lokuta should be subject to judicial discipline. Judge Streib, joined by Judge O'Toole, "join[ed] in the majority of the Court's Opinion," dissenting only to the final two conclusions, relating to the O'Brien and Bonner cases, based upon the dissent's conclusion that the relevant law clerk's testimony on those issues was not credible. *Id.* at 1136 (Streib, J., dissenting). Importantly, however, the dissent agreed with the conclusion that Judge Lokuta should be subject to judicial discipline. Indeed, only Judge O'Toole dissented from the CJD's December 2008 decision to remove Judge Lokuta from office. Judge O'Toole, instead, advocated for a sanction of a one-year suspension without pay, followed by a three-year probationary period.

At the conclusion of these proceedings and following the revelations regarding the corruption in Luzerne County, Judge Lokuta timely filed various applications in this Court. After careful consideration, we remanded the case to the CJD for:

the limited purpose of that court considering Petitioner's claims in the nature of after-discovered evidence, arising from the recent revelations of corruption in Luzerne County. The Court of Judicial Discipline is to determine whether the new evidence requires a further hearing and/or whether it affects the existing determination of the Court of Judicial Discipline to remove Petitioner from judicial office. *In re Lokuta,* 600 Pa. 504, 504, 968 A.2d 227 (Pa.2009).

The CJD heard argument on May 13, 2009, on the scope of the remand, among other matters. Without dissent, the court concluded that Judge Lokuta would not be allowed discovery, but would be permitted ninety days to investigate the connection, if any, between the corruption and her trial. Transcript (Tr.), 5/13/09, at 95–6. Following the ninety-day period, Judge Lokuta submitted documents in August, September, and October 2009. After briefing, the CJD issued a *per curiam* order, on October 27, 2009, holding that Judge Lokuta's new evidence claim did not warrant further hearing on the merits of its October, 2008, decision finding her in violation of the Judicial Code, but that the CJD would permit Judge Lokuta to present argument as to whether the new evidence affected the CJD's determination to remove her from office. Judges O'Toole and Streib, while presumably joining all other aspects of the CJD's order, noted that they would have allowed an evidentiary hearing, in addition to oral argument, on the question of whether the new evidence affected the CJD's determination to remove Lokuta from judicial office.

The CJD heard argument in November, 2009, on the sanction question, and subsequently ruled in a 4–3 majority opinion that an evidentiary hearing was not required and that the new evidence did not affect the decision to remove Judge Lokuta from office. *In re Lokuta,* 989 A.2d 942, 958 (Pa.Ct.Jud.Disc. 2010). Judge Streib, joined by Judges Musmanno and O'Toole, dissented, concluding that the new sanction hearing was justified based upon the evidence of pervasive corruption in Luzerne County, which "demonstrate[d] that this was no ordinary judicial environment and no environment to which any judge should be exposed. That, to [the dissent], is a

serious mitigating factor which does indeed militate in favor of an altered sanction in this case." *Id.* at 960 (Streib, J., dissenting).

While I join the analysis of the Majority in most respects and, as stated at the outset of this concurrence, the disposition in full, I write separately to the issues of denial of recusal, the scope of remand, and the argument in favor of a new sanction hearing.

Turning first to the question of Conference Judge Sprague's denial of Judge Lokuta's motion for recusal, I agree that this Court should affirm the denial, but I differ regarding the applicable standard of review. The Majority utilizes the standard set forth in *Joseph v. Scranton Times L.P.*, 604 Pa. 677, 987 A.2d 633, 634 (2009), and *Interest of McFall*, 533 Pa. 24, 617 A.2d 707, 712–713 (1992), which provide that "an appearance of impropriety is sufficient justification for the grant of new proceedings before another judge" and that "[t]here is no need to find actual prejudice." Maj. Op. at 238–39, 11 A.3d at 435. The cases cited, as properly described by the Majority Opinion at 238–40, 11 A.3d at 435–36, involve situations where the involved judges apparently hid information relevant to the recusal issue from the potentially aggrieved parties. Importantly, because the information was unknown to them, the parties did not file motions for recusal. Unlike in *Joseph* and *McFall,* Judge Lokuta presented Conference Judge Sprague with motions for recusal, and Conference Judge Sprague addressed and denied the allegations raised. In such cases, an appellate court reviews the judge's denial on an abuse of discretion standard, determining whether a fair and impartial trial occurred:

> It is incumbent upon the proponent of a disqualification motion to allege facts tending to show bias, interest or other disqualifying events, and it is the duty of the judge to decide whether he feels he can hear and dispose of the case fairly and without prejudice because we recognize that our judges are honorable, fair and competent. Once this decision is made, it is final and the cause must proceed. The propriety of this decision is grounded in abuse of discretion and is preserved as any other assignment of error, should the

objecting party find it necessary to appeal following the conclusion of the cause. If the cause is appealed, the record is before the appellate court which can determine whether a fair and impartial trial were had. *If so, the alleged disqualifying factors of the trial judge become moot.*
*Reilly by Reilly v. Southeastern Pennsylvania Transp. Authority,* 507 Pa. 204, 489 A.2d 1291, 1300 (1985) (emphasis in original). I review Judge Lokuta's arguments in accord with this standard and criteria.

As referenced at footnote 1, Judge Lokuta claims that Conference Judge Sprague should have recused due to his representation of Robert Powell and PA Child Care, who have been implicated as central figures in the corruption in Luzerne County. Judge Lokuta asserts that the need for recusal was demonstrated by Conference "Judge Sprague's evidentiary rulings that effectively closed the door on the development of a public record potentially harmful to Powell, PA Child Care, Conahan, and Ciavarella." Brief for Lokuta at 13. As evidence of his partiality, she asserts, "Judge Sprague issued his Order as to the admissibility of trial exhibits largely sustaining the JCB's objections to Judge Lokuta's exhibits." Brief for Lokuta at 13. She also asserts, "[i]t is now reasonably evident that, had Judge Lokuta been permitted to properly explore the relationships among Powell, PA Child Care, Conahan, and Ciavarella, a record would have been created tying Judge Sprague's clients to Conahan and Ciavarella's criminal enterprise and corrupt influence." Brief for Lokuta at 17. While she makes these broad allegations regarding Conference Judge Sprague, she fails to provide citations to the record in support of her claims.

Rather than presenting a "summary denial" complete with "venomous rhetoric" as Judge Lokuta claims, Brief for Lokuta at 14, Conference Judge Sprague in his May 13, 2009, Memorandum Opinion and Order denying the Second Recusal Motion provided a thirteen-page detailed and scholarly analysis to refute Judge Lokuta's arguments in favor of recusal. I discuss only a few representative aspects of his denial. Conference Judge Sprague observed that a review of the word index

to the 3,893 pages of the trial transcript revealed only one unrelated mention of Robert Powell and no mention of PA Child Care. May 13, 2010 Memorandum Opinion at 9–10. My review of the record confirms Conference Judge Sprague's assertion, and thus refutes Judge Lokuta's claim that Conference Judge Sprague prevented her from developing a connection between his clients and the former president judges. Additionally, my review of the record sheds light upon Judge Lokuta's claim that Conference Judge Sprague "largely sustained the JCB's objections" to her trial exhibits. Judge Lokuta fails to note that while Conference Judge Sprague sustained twenty-one of the JCB's thirty objections to trial exhibits, he did nothing to impede Judge Lokuta's introduction of over one thousand exhibits, as compared to the approximately thirty exhibits introduced by the JCB. Order of February 28, 2008. Without further development by Judge Lokuta, the sustaining of twenty-one objections does not demonstrate a need to overturn a denial of recusal. For these reasons, I conclude that Conference Judge Sprague presented valid reasons for denying the motion for recusal, and Judge Lokuta fails to present evidence that she was denied a fair and impartial trial.

The second issue upon which I diverge from the Majority Opinion involves the scope of our remand order. The Majority Opinion approves the CJD's narrow reading of the order limiting Judge Lokuta to claims in the nature of after-discovered evidence that relate only to corruption revealed shortly before the remand order, and concomitantly prohibiting inquiry into any revelations of misconduct in Luzerne County discovered after this court's ordered remand. Maj. Op. at 241–43, 11 A.3d at 437–38. Indeed, in the aftermath of the May 13, 2009 oral argument regarding, *inter alia,* the scope of remand, the CJD defined the phrase from the remand order— "claims in the nature of after-discovered evidence, arising from the recent revelations of corruption in Luzerne County,"—to apply solely to "those filings that have been placed on the public record in Luzerne County, meaning the pleas of guilt by Judge Conahan, Judge Ciavarella, Mr. Sharkey, and

even including the agreement involving Moran, but it is the position of this Court that all arguments are to be from those matters." Tr., 5/13/09, at 46.[2] Thus, the CJD's interpretation of our remand order was arguably even narrower than as described in the Majority Opinion.

Judge Lokuta asserts that the CJD's interpretation was an "artificially narrow interpretation of the scope of the remand." Brief for Lokuta at 19. She contends that the remand should have extended to "the growing body of evidence in the public record speaking directly to Conahan and Ciavarella's corrupt influence over others." Brief for Lokuta at 19. I agree that it would have been better to allow investigation concerning any information even potentially related to a connection between the culture of corruption created by the former president judges and the prosecution of Judge Lokuta, in that this Court's remand was to permit full exploration of the unprecedented corruption in Luzerne County, its impact upon the CJD's removal of Judge Lokuta, and the nexus between the two.

Nonetheless, I agree with the Majority Opinion's affirmance of the decision below, despite the narrow scope of review on remand, because Judge Lokuta was unable to show any prejudice resulting from the CJD's restrictive interpretation of our remand order. While she appropriately presents damning evidence of the former judges' power and corruption, she fails to discredit the vast majority of the copious evidence from more than twenty witnesses who testified for day upon day to the litany of improper judicial conduct described at the beginning of this concurrence. Moreover, she fails to allege what evidence she would have presented to the CJD if she had been allowed. Accordingly, I agree with the Majority Opinion to the extent that it concludes that the CJD's interpretation of this Court's remand order does not justify overturning the decision.

2. After the Court issued its order regarding the scope of review upon remand, Ciavarella and Conahan withdrew their guilty pleas. The Court acknowledged that this limited Judge Lokuta on remand to exploration of only "matters that involve the criminal activity of those individuals." Tr., 11/17/09, at 5.

Finally, I consider the issue of the appropriateness of a new sanction hearing following the revelations of the corruption in Luzerne County. The Majority addresses this issue as a question of the sufficiency of the evidence and appropriately observes, "[q]uestions of credibility and conflicts in the evidence presented are for the trial courts to resolve, not our appellate courts." Maj. Op. at 255, 11 A.3d at 445–46. Nonetheless, I am compelled to note the argument in favor of a new sanction hearing convincingly articulated by Judge Streib in her dissent following our remand:

> Indeed, it is most ironic that Judge Lokuta would be criticized by this Court for isolating herself and her staff from the very people who have now been indicted for misusing their public office and position to commit crimes that strike at the heart of our judicial system. And, it is also most ironic that these same people are called by the Board to bear witness against Judge Lokuta, but yet she is precluded from presenting evidence regarding their far more serious misdeeds and criminal activities.

> More importantly, however, I find Judge Lokuta's proffered evidence most pertinent to the sanctions imposed by this Court as a result of the charges brought against her by the Board. That evidence demonstrates that this was no ordinary judicial environment and no environment to which any judge should be exposed. That, to me, is a serious mitigating factor which does indeed militate in favor of an altered sanction in this case. Accordingly, I dissent from the majority's determination that the evidence proffered by Judge Lokuta does not meet the requirements of after-discovered evidence and would not, in any event, have affected the outcome of this case.

*In re Lokuta,* 989 A.2d at 960 (Streib, J., dissenting).

Although on a personal level I agree with Judge Streib and would have voted with the dissent if a member of the CJD, my personal judgment does not supplant my obligation to consider whether there was sufficient evidence to support the CJD's majority decision to deny a new sanction hearing. I believe there was such evidence, and therefore, that the majority of

the CJD acted within its sound discretion in denying such hearing, necessitating my vote to affirm.

Accordingly, I am constrained to join the majority of my colleagues in affirming the decision of the Court of Judicial Discipline.

Justice SAYLOR, dissenting.

While crediting the factual assertions contained in Judge Sprague's decision on Appellant's motion to recuse, I am nevertheless of the view that Rule 5(C)(2) of the Rules Governing the Conduct of Members of the Court of Judicial Discipline—which provides that "[a] member should not participate in a proceeding in which the member's impartiality might reasonably be questioned"—compelled his recusal on account of his representation of Robert Powell and PA Child Care, LLC, who and which were connected to the extraordinary judicial corruption present in Luzerne County in a time period relevant to the proceedings against Appellant.